# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

```
**************************************************
                                    *
GEUNG-HO KIM and                    *
JAE KIM,                            *
                    Plaintiffs      *
                                    *      Civil Action No.
v.                                  *      3:15-CV-00879 (VLB)
                                    *
STATE FARM FIRE AND CASUALTY COMPANY, *    October 21, 2016
                    Defendant       *
                                    *
**************************************************
```

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COME the plaintiffs, Geung-Ho Kim and Jae Kim (hereinafter collectively referred to as "the Kims"), and submit the following Memorandum of Law in Opposition to the defendant, State Farm Fire and Casualty Company's (hereinafter "State Farm"), Motion for Summary Judgment.

## STATEMENT OF FACTS

The Kims bought their home at 121 Windshire Drive, South Windsor, Connecticut in 2004. (Ex. 5, Examination Under Oath of Geung-Ho Kim, p. 12-13; Ex. B, Examination Under Oath of Jae Kim, p. 11). The home was built in 1984. (Ex. 2, Deposition of David Grandpré, p. 78; Ex. D, Report of David Grandpré, p. 1). In connection with the purchase of their home, the Kims obtained a home

**ORAL ARGUMENT REQUESTED**

inspection.  (Ex. E, Home Inspection Report).[1]  While the home inspection report noted evidence of efflorescence as a potential sign of water intrusion, the home inspector did not inform the Kims of any cracking in their basement walls or the potential that the structural integrity of those basement walls were in any way compromised.  (Ex. E, p. 12 of 17).  While the Kims do not recall having any substantive conversation with the home inspector, they understood his opinion to be that the home was in satisfactory condition.  (Ex. 5, p. 21).  The Kims went forward with the purchase of the home, relying on the inspector's determination that there were no structural problems.  (Ex. 5, p. 48).  The Kims do not recall observing cracking at the time that they purchased the home.  (Ex. 5, p. 48; Ex. B, p. 30-32). [2]

---

[1] The Kims recognize that State Farm has submitted copies of the home inspection, however, these copies are not particularly legible.  The Kims have elected to submit a more legible copy.

[2] In support of the assertion that the Kims had perceived the cracking at the time they purchased the house, State Farm cites the following passage from Mr. Kim's examination under oath:  "It's been that way from the beginning when we bought the house."  (Ex. 5, p. 47).  However, Mr. Kim immediately clarified that statement under subsequent questioning:

> "Q.    So what's visible in the unfinished parts of the basement has been consistent throughout your ownership of the house; is that correct?
>
> A.    I don't recall.  I can imagine.  I don't know is it changing bit by bit very gradually.  I cannot tell.  Sorry, I cannot tell is it exactly the same or a little bit changed.  I cannot tell, but it's…
>
> Q.    But there was some level of cracks present from the very start of your ownership; is that correct?
>
> A.    Not correct.  No, I don't think so.  I don't recall; I didn't check.  I didn't pay attention basically except this guy, this gentleman says no structural problems.  So, okay, and that's it for me."
> (Ex. 5, p. 48, l. 18-p. 49, l. 8).

For her part, Mrs. Kim does not recall seeing any cracking in the interior basement walls, though she does recall seeing cracking in the skim coat on the exterior of the basement walls.  (Ex. B, p. 31-32).

In 2014, the Kims decided to list their home for sale. (Ex. 5, p. 15-16; Ex. B, p. 25). Mr. Kim had retired and the Kims wished to move to Mexico in furtherance of their missionary work. (Ex. 5, p. 15-20; Ex. B, p. 24-25). The Kims' home was on the market for approximately three days when one of the prospective buyer's agents noticed cracking and informed the Kims' realtor of the situation. (Ex. 5, p. 45; Ex. B, p. 30-31). At the suggestion of their realtor, the Kims' retained a structural engineer to examine their basement walls. (Ex. 5, p. 45; Ex. B, p. 30-31). William Neal, P.E., inspected the basement walls of the Kims' home on July 3, 2014, and determined that the cracking condition was caused by a chemical reaction occurring within the basement walls of the home and that the entire basement wall system would need to be removed and replaced. (Ex. 3, p. 1; Ex. 5, p. 55-57; Ex. B, p. 37-39). Prior to Mr. Neal's report, the Kims were unaware of any structural problem with their home. (Ex. 5, p. 56-57; Ex. B, p. 30-31).

The Kims have insured their home at 121 Windshire Drive with State Farm since they purchased the property in 2004. (Ex. 5, p. 41-44). The policy issued by State Farm is an all-risk homeowner's insurance policy, covering against all risks not explicitly excluded. (Ex. F, Homeowners Insurance Policy).[3] In particular, State Farm agreed to "insure for accidental direct physical loss to the property…except as provided in Section I – Losses Not Insured." (Ex. F, Form

---

[3] The Kims recognize that State Farm has offered an earlier policy in support of its motion, however, State Farm's copy of Form FP-7955 is not particularly legible. The Kims offer a later policy, which was attached to their complaint in this matter, as this particular version of Form FP-7955 is much easier to read. While there is a different Amendatory Endorsement (Connecticut) form, there does not appear to be any material difference in the language of the two as they relate to this matter.

FP-7955, p. 7).  The base policy form excludes losses for collapse, except as provided in the additional coverage for collapse found in the policy.  (Ex. F, Form FP-7955, p. 6, 11).  By endorsement, State Farm removed the additional coverage for collapse, but also removed the policy exclusion for losses consisting of or caused by collapse.  (Ex. F, Form FE-7207.6, p. 1 of 3).

The Kims reported the claim at issue to State Farm by way of correspondence from their counsel dated July 7, 2014.  (Ex. G, Correspondence from Brenda A. Draghi, Esq.).  In response to the claim submitted by the Kims, State Farm dispatched an engineer to inspect the property.  (Ex. H, Report of Corrosion Probe, Inc.).  State Farm's engineer determined that the cause of the deterioration of the Kims' basement walls was an expansive chemical reaction occurring within the concrete forming those walls.  (Ex. H, p. 8).  State Farm's engineer also noted the presence of significant network cracking and found that at least one wall was no longer plumb.  (Ex. H, p. 3-4).  State Farm denied coverage for the damage to the Kims' home by way of letter dated March 16, 2015, citing a number of policy exclusions and conditions.  (Ex. I, Denial Letter).

Following State Farm's denial of the Kims' claim, the basement walls were inspected by David Grandpré, P.E., on December 7, 2015.  (Ex. D, p. 1).  Mr. Grandpré found that the structural integrity of the Kims' basement walls was, at the time of his inspection, substantially impaired.  (Ex. D, p. 4).  The extensive pattern of horizontal and vertical cracking and deterioration throughout the basement wall structure suggests one of two (2) possible chemical reactions, an

alkali-silica reaction or the oxidation of iron sulfide in the aggregate used to make the concrete. (Ex. D, p. 4). Both reactions occur within the concrete on a microscopic level and cause the concrete to break down internally. (Ex. D, p. 4). At the time of the Grandpré inspection, portions of the basement wall had already structurally failed. (Ex D, p. 4). Mr. Grandpré has further opined that the chemical reaction cannot be arrested and that the only viable remedy to this condition is the complete removal of the basement walls and replacement with new basement walls made with good and sufficient concrete. (Ex. D, p. 5).

**ARGUMENT**

The Kims suggest that State Farm has not met its burden with respect to the summary judgment sought. Rather, the Kims suggest that the record on summary judgment clearly shows that there has been a collapse of the basement walls of their home. The Kims further suggest that the collapse was accidental and covered by the policy despite the policy provisions relied upon by State farm. To the extent that the record does not clearly demonstrate such a covered collapse, or the timing of such a covered collapse, this lack of clarity arises from factual issues that must be resolved by a jury – precluding summary judgement. Furthermore, the record on summary judgment suggests that the Kims timely filed suit against State Farm and, therefore, the case is not barred by the suit limitation provisions contained in the operative insurance policy or policies.

I.    **Standard for Ruling on a Motion for Summary Judgment.**

State Farm's representation of the standard used when ruling on a motion

for summary judgment is largely complete. However, the Kims wish to offer some clarifications to State Farm's recitation. State Farm, as the moving party, has the burden of proving that it is entitled to summary judgment. *United Transp. Union v. Nat'l R.R. Passenger Corp,* 588 F.3d 805, 809 (2d Cir. 2009). To meet this burden, the moving party must demonstrate that there are no genuine issues of material fact. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). It is only when the movant satisfied this burden that a "limited burden of production shifts to the nonmovant." *Cobb v. Metro-North R. Co.,* 41 F.Supp.3d 145, 149 (D.Conn. 2014). In determining whether the movant has sustained its burden of demonstrating an absence of factual issues, "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).

"When ruling on a motion for summary judgment, the court must respect the province of the jury." *Cobb v. Metro-North R. Co.,* 41 F.Supp.3d 145, 149 (D.Conn. 2014). Therefore, when deciding a motion for summary judgment the court must not decide issues of fact. *Id. citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "It is well-established that '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.'" *Id.* "Thus, the trial court's task is 'carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to

issue-finding; it does not extend to issue-resolution.'" *Id. citing Gallo Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994).

II.    <u>Standard for Insurance Policy Interpretation.</u>

The standards for construing the terms of an insurance policy in Connecticut are clear.    Construction of an insurance policy involves a determination of the parties' intent as expressed by the policy language. *Conn. Ins. Guar. Ass'n v. Fontaine,* 278 Conn. 779, 784 (2006).    However, when performing this analysis, the court must construe the policy terms "as laymen would understand them and not according to the interpretation of sophisticated underwriters." *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009). In particular, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Id.*

Where policy terms are unambiguous those terms are accorded their natural and ordinary meaning. *Jacaruso v. Lebski,* 118 Conn. App. 216, 233 (2009).  However, where a term is susceptible to more than one reading, the term is construed against the insurance company as they drafted the policy terms. *New London County Mut. Ins. Co. v. Zachem,* 145 Conn. App. 160, 166 (2013). Ambiguous insurance policy terms are not only construed against the insurance company, they are construed in favor of coverage. *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Mut. Assurrance Co.,* 205 Conn. 246, 249-250 (1987).

III.   **There is Coverage Under One or More Policies Issued by State Farm Because an Insured Building Collapsed.**

The Kims suggest that the threshold question in this case is whether there has been a collapse loss such that the all-risk coverage provided by the policy would be triggered.  The question of collapse has both factual and legal elements.  Although State Farm makes little reference to the extent of the deterioration, there is no real question but that the concrete walls of the basement of the Kims' home have decayed and broken apart in a manner completely uncharacteristic of ordinary concrete.   (Ex. 2, p. 40-41; Ex. D, p. 3-4).   After inspection of the condition, the Kims' engineering expert, David Grandpré, concluded that the concrete basement walls of the home were substantially structurally impaired.  (Ex. 2, p. 74-76; Ex. D, p. 4).   Grandpré opines that the extensive pattern of horizontal and vertical cracking and deterioration throughout the wall structure suggested one of two (2) possible chemical reactions, an alkali-silica reaction or the oxidation of iron sulfide in the aggregate used to make the concrete.  (Ex. 2, p. 30-33; Ex. D, p. 4).   Both reactions occur within the concrete on a microscopic level, which causes the concrete to break down internally.  (Ex. 2, p. 30-33; Ex. D, p. 4).   Irrespective of the precise reaction occurring, the end result has been that the concrete of the basement walls has become so impaired that portions of those basement walls have structurally failed and that the basement walls can no longer be relied upon to perform their intended functions of supporting the wooden portion of the home and opposing the lateral pressure of the surrounding soil.  (Ex. 2, p. 74-76; Ex. D, p. 3-4).

Even in light of these structural defects in the Kims' basement walls, State Farm points to a number of potentially applicable policy exclusions, including: (i) wear and tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown, (ii) use of defective materials in construction, and (iii) cracking. While the Kims disagree with State Farm's analysis with respect to some of these exclusion under the facts present in this matter – particularly with respect to wear and tear[4] – each of the sections containing the cited exclusions suggests that even where damage is caused by or consists of these excluded conditions the policy provides coverage from any resulting loss not itself specifically excluded.[5] (Ex. F, Section I – Losses Not Insured, para. 1 and para. 3). While Connecticut homeowners faced with the deterioration of their home due to the damage associated with Mottes concrete typically look to the additional coverage for "collapse", State Farm has elected to delete that policy provision. (Ex. F, Form FP-7955, Section I – Additional Coverages, p. 6, para. 11, as amended by Form FE-7207.6, p. 1 of 3). However, State Farm made another significant, and related, deletion in removing the exclusion for losses "which consists of, or is

_____

[4] The legal analysis offered by State Farm with respect to the exclusion for "wear and tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown" suggests that this exclusion applies to damage that is a result of the type of degradation expected to occur due to the normal and reasonable use of an object over time. *See e.g. Waldron v. Richardson,* 1992 WL 361501, * 5 (Conn. Super. 1992); *Ehsan v. Ericson Agency,* 2003 WL 21716345, * 15 n.18 (Conn. Super. 2003). Here we have a situation where the concrete basement walls of a home are deteriorating in a manner *not* expected of concrete and not as a result of the normal or reasonable use of concrete over its intended useful life. (Ex. 2, p. 40-41; Ex. D, p. 3). Under State Farm's own legal analysis, it would seem that the damage afflicting the Kims' home is not what one would consider wear and tear or marring.

[5] Unlike the exclusions for wear and tear and cracking, the policy does not necessarily exclude losses *caused* by defective materials used in construction or repair, only those loses *consisting* solely of such damage. (Ex. F, Section I – Losses Not Insured, para. 3).

directly and immediately caused by…*collapse….*" (Ex. F, Form FP-7955, Section I – Losses Not Insured, para. 1, subpara. a, as amended by Form FE-7207.6, p. 1 of 3)(emphasis added).  As a result of deletion of this exclusion, a collapse loss is covered in the first instance as part of the all-risk coverage and, should also be covered as a resulting loss as it is no longer specifically excluded.  State Farm has admitted as much in its brief.  (Memorandum of Law, Doc. No. 31, p. 28, footnote 7).

In light of the severely compromised structural condition of the basement walls, going well beyond mere cracking, the legal element arises as to whether loss or resulting loss of collapse has occurred.  Admittedly, there was not the kind of catastrophic "tumbling down" or "falling down" that one often associates with the word "collapse."  Although in other cases, insurers have argued that a "collapse" sufficient to invoke policy coverage must involve a catastrophic "falling down," the majority of the courts construing homeowner's policy usage of the term have disagreed.  The Supreme Court of Connecticut stands in the foreground of that majority, having ruled in 1987 that collapse coverage should be afforded where there has been a "substantial impairment of the structural integrity of a building." *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987).

The reasoning behind the court's conclusion is straight-forward.  To require an owner who knows of a substantial impairment to the integrity of the insured structure to await complete, catastrophic destruction before losses are to

be covered would subvert the insured's duty to mitigate damages and avoid economic waste. *Id.* at 253 n.2. Certainly, the word "collapse" can be thought of as a sudden and complete catastrophe, but it is also defined as a "breakdown in vital energy, strength or stamina…" *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 250 (1987) *citing* Webster, Third New International Dictionary. The *Beach* Court acknowledged that "collapse" could be defined either as a sudden event or a gradual breakdown of a structural strength. *Id.* In either case, under common principles of insurance law, the insurer would have the obligation to define collapse as a sudden event, if that was the meaning it sought to convey. *Id.* at 251. While State Farm made some effort to define the term "collapse" in its additional coverages section, that definition of collapse was deleted along with the remainder of that provision. (Ex. F, Form FP-7955, p. 6, para. 11 as amended by Form FE-7207.6 p. 1 of 3).

State Farm points to *Sansone* to suggest that the *Beach* analysis is not appropriate in this context. However, *Sansone* is quite distinguishable with respect to the policy language at issue in this matter. The *Sansone* Court declined to impose a *Beach* collapse under that factual situation because the policy did not contain specific reference to "collapse."[6] *Sansone v. Nationwide Mut. Fire Ins. Co.,* 47 Conn.Supp. 35, 41 (Conn. Super. 1999). Unlike the policy at issue in *Sansone*, the policy issued to the Kims' does specifically references

---

[6] The *Sansone* Court noted that had the policy made a specific reference to "collapse" the ensuing loss argument would be persuasive. *Sansone v. Nationwide Mut. Fire Ins. Co.,* 47 Conn.Supp. 35, 41 (Conn. Super. 1999).

collapse in a number of instances.  That coverage for collapse is not an expressly enumerated additional coverage is not determinative to the issue of whether *Beach* applies, as the "collapse" referenced in *Beach* was not found in an additional coverage.  *Beach v. Middlesex Mut. Assurance Co.,* 205 Conn. 246, 250 (1987).    Rather, *Beach* involved an ensuing loss provision which provided coverage for a collapse that followed consequentially from an excluded activity. *Id.* at 251-252; *see also Yale University v. Cigna Ins. Co.,* 224 F.Supp.2d 402, 420-421 (D. Conn. 2002).  Unlike *Sansone,* the interplay between the base insurance policy and the Connecticut amendatory endorsement clearly establishes that a collapse, which is undefined in absence of the additional coverages section, is a covered loss.  (Ex. F, Form FP-7955, p. 6, para. 11 as amended by Form FE-7207.6 p. 1 of 3).

Where an insurance policy is properly amended by way of endorsement, "the policy…and the endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by the parties."  *Dairyland Ins. Co. v. Mitchell,* 320 Conn. 205, 212-213 (2016) *citing Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.,* 290 Conn. 767, 806 (2009); *see also Winchester Indus., Inc. v. Sentry Ins.,* 536 F.Supp.2d 203, 208 (D.Conn. 2008)("The insurance policy must be construed in its entirety, with all of its relevant endorsements, exclusions and provisions considered in connection with one another.")(internal citations omitted).  The base policy issued by State Farm to the Kims specifically excludes losses consisting of or caused by "collapse,"

except as provided in the additional coverage for that peril. (Ex. F, Form FP-7955, Section I – Losses Not Insured, para. 1, subpara. a). The amendatory endorsement deletes this specific exclusion, along with the additional coverage, thereby restoring all-risk coverage for the peril of collapse. (Ex. F, Form FE-7207.6, Section I – Losses Not Insured, p. 1 of 3). That the collapse of a building or part of a building is a covered peril is further reinforced by a related change to Paragraph 2 of Section I – Losses Not Insured, which changes the introductory paragraph to read "We do not insure under any coverage for any loss (*including collapse of an insured building or part of an insured building) which would not have occurred in the absence of one or more of the following excluded events…."[7] (Ex. F, Form FE-7207.6, Section I – Losses Not Insured, p. 1 of 3)(emphasis added). When viewing all of the relevant policy provisions, it is clear that unlike the policy at issue in *Sansone* the State Farm policy not only references, but covers, collapse losses both as part of the all-risk coverage and also if it results from another excluded peril.

The interplay of the policy language and the relevant endorsements is quite convoluted in this instance. Nevertheless, it would seem only reasonable, even to a lay person, that where the specific exclusion of a peril is then deleted from an all risk policy, that peril must now be a covered risk. As policies are to be interpreted as a lay person would understand them and to protect the reasonable expectations of the policyholder, the Kims suggest that where the damage to

---

[7] Section I – Losses Not Insured, Paragraph 2, involves the exclusions not raised by State Farm in its motion. (Ex. F, Form FP-7955, Section I – Losses Not Insured, para. 2).

home reaches the point of a "collapse" it should be covered under the policy issued by State Farm as that specifically enumerated exclusion was removed from the policy. *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009). Furthermore, because the definition of the term "collapse" was similarly stripped from the policy by endorsement, it is reasonable to ascribe the meaning to that term that has been determined by the law of Connecticut for almost thirty (30) years. *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987). It is only reasonable for an insured to expect that where a term is initially defined by an insurance policy, but that definition is then deleted by endorsement, it no longer applies to exclude or otherwise limit coverage.

Now combining the factual description reported by Grandpré, with the *Beach* definition of collapse, the conclusion seems inescapable that the building or a part of the building had collapsed by July 3, 2014 – when Mr. Neal inspected the Kims' home – and certainly by December 7, 2015 when Mr. Grandpré inspected the premises. (Ex. 3; Ex. D, p. 1). The deterioration of the basement walls impacts the structural integrity of not only the walls themselves, but of the portions of the building above as the upward motion of the basement walls acts upon the structural elements above those walls. (Ex. 2, p. 75-76). As such, it is reasonable to suggest that the damage has progressed to a point beyond mere cracking and has resulted in a loss beyond the scope of those exclusions cited by State Farm. Furthermore, State Farm offers no contradictory opinion with respect to the structural integrity of the Kims' home in support of its motion for

summary judgment.[8]  Of course, any such contradictory opinion would simply create a material issue of fact precluding summary judgment as to the issue of collapse.

**IV.    The Collapse of the Kims' Home Was Accidental for Purposes of the State Farm Policy.**

State Farm suggests that because the damage associated with the Mottes Concrete is set in motion from the moment that concrete is poured, the ultimate loss cannot be accidental or fortuitous and, therefore, cannot be covered by an all-risk insurance policy.  While the Kims acknowledge that the loss must be "accidental" or "fortuitous," they respectfully disagree with State Farms analysis in that regard.  Once focused on the actual implications of the fortuity doctrine, the inescapable conclusion is that the loss suffered to the Kims' home was both accidental and fortuitous.

In *Yale University* this Honorable Court acknowledges that "[b]roadly stated, the fortuity doctrine holds that insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur."  *Yale University v. Cigna Ins. Co.,* 224 F.Supp.2d 402, 414 (D. Conn. 2002) *citing National Union Fire Ins. Co. v. Stroh Cos., Inc.,* 265 F.3d 97, 106 (2d Cir. 2001).  However, fortuity must be determined "by standing in the shoes of the parties at the time the contract of insurance was made."  *Id. citing Standard Structural Steel Co. v. Bethlehem Steel Corp.,* 597 F.Supp. 164, 163 (D. Conn.

---

[8] In fact, State Farm's engineer has opined that the basement walls "appeared stable with no evidence of imminent collapse."  (Ex. H, p. 9 of 40).  However, State Farm has elected not to offer this report in an attempt to contradict Mr. Grandpré's analysis of the home's structural integrity.

1984).  When analyzing fortuity properly, it is clear that the Kims did not know of the structural issues within their home, know that they were substantially certain to occur, nor did they plan or intend them.  The Kims' lacked this knowledge or intent from the moment that the contract was formed up until they were informed of the chemical reaction occurring within the basement walls of their home on July 3, 2014.  (Ex. 3; Ex. 5, p. 56-57; Ex. B, p. 30-31).  Not only did they lack the knowledge of the damage, it is not even clear that they ever observed the cracking prior to July of 2014.  (Ex. 5, p. 48; Ex. B, p. 31-32).  Examining the knowledge of the Kims, at the time that the contract is formed, it is clear that the damage now known to be present in their home was fortuitous in so far as they are concerned.

Furthermore, while the *Yale University* Court noted that the Connecticut Supreme Court had not yet fully defined the parameters of the fortuity doctrine, the Connecticut Supreme Court has since weighed in on that issue in a manner material to this claim.  In *Capstone* the Connecticut Supreme Court dismissed the notion that damage related to defective construction lacks the element of "fortuity" necessary for coverage.  *Capstone Bldg. Corp. v. American Motorist Ins. Co.,* 308 Conn. 760, 775 (2013).  Noting that it had previously held that "[a]n accident is an event that is unintended from the perspective of the insured" the *Capstone* Court held that the fact that defective construction is somewhat volitional did not preclude it from coverage.  *Id. citing Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 594 (2009).  Because the negligent work was

unintentional from the point of view of the insured, the Supreme Court found that the negligent work could be considered an accident or occurrence under the terms of the policy before the *Capstone* Court. *Id.* at 776.

While *Capstone* did involve a different policy language, the Kims suggest that reasoning is applicable to the analysis of this instant matter. *Capstone* construed the term "occurrence" which term was there defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[9] *Id.* at 774. However, the *Capstone* Court did construe the term occurrence by its inclusion of the term "accident" in its definition. *Id.* In doing so, the *Capstone* Court noted that the term "accident" has been held to mean an "unexpected happening" or "unexpected or unintended." *Id. citing Commercial Contractors Corp. v. American Ins. Co.,* 152 Conn. 31, 42 (1964); *Buell Indus. Inc. v. Greater New York Mut. Ins. Co.,* 259 Conn. 527, 541 (2013). The related term "accidental" is, unsurprisingly, similarly defined as "happening by chance, unintentionally, or unexpectedly." Oxford American Dictionary and Thesaurus (2003). Again, finding that negligent work is unintentional from the point of view of the insured, the *Capstone* Court found that a loss caused by negligent work is both an "accident" and an "occurrence." *Capstone Bldg. Corp. v. American Motorist Ins. Co.,* 308 Conn. 760, 775 (2013).

---

[9] The insurance policy issued to the Kims has a similar definition of the term "occurrence," however, that term applies only to losses under Section II of the policy. (Ex. F, Form FP-7955, Definitions, para. 7, p. 2).

It is not disputed that the damage impacting the Kims' home is related to the use of defective concrete in the construction of the home. (Ex. 2, p. 30-33). However, the record is also clear that the Kims were not aware of the problems occurring within the concrete of their basement walls until July of 2014 – some ten (10) years after they purchased the home and began insuring with State Farm. (Ex. 5, p. 56-57; Ex. B, p. 30-31). The record is also clear that the Kims did not expect that there was any defect within their concrete basement walls or even that concrete could be susceptible to such a defect. (Ex. 5, p. 46, 48). The Kims' expert opines that the concrete basement walls of a home are deteriorating in a manner not expected of normal concrete. (Ex. 2, p. 40-41; Ex. D, p. 3). Further, the record suggests that a layman would not even be expected to adequately diagnosis the chemical reaction occurring within the home without specialized training in analyzing the pattern of cracking. (Ex. 2, p. 35-36, 42-43). Therefore, it seems clear that the damage suffered to the home was not only unintended by the Kims, but also wholly unexpected. As a result, it seems that State Farm's arguments with respect to fortuity are misplaced and contrary to Connecticut law. That the walls were defective from the outset is not determinative as to whether any subsequent loss flowing from the chemical reaction at play is fortuitous.

V.    Underline State Farm Does Not Meet its Burden with Respect to Whether the Loss Occurred Outside of its Policy Period.

State Farm argues that any loss to the Kims' home occurred prior to its period of coverage and is, therefore, not covered by its policies. State Farm relies, primarily, on the Kims' expert engineer in advancing this theory. However,

Mr. Grandpré's opinions are a bit more nuanced than State Farm lets on and to the contrary. Respectfully, its arguments miss the mark. In addition, simply because a substantial impairment may have occurred prior to State Farm's coverage period, that does not, of itself, mean that none of State Farm's policies have been triggered by this condition.

State Farm correctly notes that Mr. Grandpré considers the concrete commonly associated with Mottes, poured during the time period where it seems likely that that firm used improper aggregate in batching that concrete, defective from the outset. (Ex. 2, p. 39). State Farm takes this opinion and contends that the walls were therefore substantially impaired from the moment they were poured. The Kims suggest, however, that Mr. Grandpré's analysis is not quite that simple. While the concrete walls of a home constructed with this type of defective concrete are certain to, at some point, become substantially impaired, and thereby contain the seeds of substantial impairment from the time that they are poured, Mr. Grandpré's opinion is really that the inherent impairment becomes substantial when the walls crack to the level where they are no longer the solid homogenous mass they were intended to be. (Ex. 2, p. 39-40, 75; Ex. D, p. 3). On that point, Mr. Grandpré does not believe that the cracking is apparent from the time of pour. (Ex. 2, p. 36). The reaction progresses over time and begins to produce initial exterior cracking, this initial cracking would be hairline in nature and neither obvious nor readily capable of diagnosis by a lay person. (Ex. 2, p. 35-36). Eventually, as the deterioration progresses, the concrete

weakens to the point that it is no longer the solid mass that it is intended to be. (Ex. D, p. 4).

While the reaction may be expected to start as soon as the walls are poured, it is a process of deterioration that leads to the level of cracking whereby the concrete walls cease to be a solid mass. (Ex. 2, p. 75; Ex. D, p. 3). Eventually, the walls will reach a state of bulging and bowing, which condition demonstrates that portions of the wall have actually structurally failed. (Ex. D, p. 4). Given his experience in seeing these homes over the years and in various states of decay, he would expect there to be visible cracking around fourteen years after the walls were poured. (Ex. 2, p. 41-42). However, Mr. Grandpré also believes that there are variables that may affect the progression of the condition in each individual home. (Ex. 2, p. 36-37). Therefore, while Mr. Grandpré would expect a home such as the Kims' to have a severity of deterioration whereby the concrete walls would have stopped being a solid mass by the early 2000s, the rate of progression is not necessarily the same for each and every property. (Ex. 2, p. 36-37, 41-42).

While the average lay person would not likely be able to diagnose the chemical reaction within the walls of their home, the observations of a homeowner, or lack thereof, may assist in tracking the progression of the problem. For instance, the Kims do not recall observing cracking in their basement walls at the time they purchased the home. (Ex. 5, p. 48; Ex. B, p. 30-32). The home inspection report commissioned in connection with the purchase of the home does not note the presence of cracking in the basement walls of the

home.  (Ex. 4).[10]  While there is a picture attached to the home inspection report that appears to show exterior cracking, the exterior basement walls of the home were coated with a cement parging.  (Ex. B, p. 31-32).  While the cracking of the parging may be connected with the expansive reaction in the basement walls, the record does not suggest a definitive link between the two.[11]  This cracking was, of course, not of a sufficient magnitude to be noted in the home inspectors report. (Ex. E).  For that reason, the Kims suggest that State Farm does not meet its burden of establishing that a substantial impairment occurred prior to the period of time that it covered the property.

Furthermore, the timing of the substantial impairment to the structural integrity of the Kims' home is only a part of the analysis as to what particular policy or policies provide coverage for the loss.  While the Kims suggest that the policy in force at the time that the impairment to the structural integrity of their home became substantial should properly cover the loss, the law suggests that this is not the sole policy to be triggered by the condition.  In *United Technologies* this Honorable Court predicted that Connecticut would utilize the multiple injury trigger in an instance of gradual or progressive loss.  *United Technologies, Inc. v. American Home Assur. Co.,* 989 F.Supp. 128, 153 (D.Conn. 1997); *see also Travelers Cas. and Sur. Co. of America v. Netherlands Ins. Co.,*

---

[10]  The Kims have submitted their own iteration of the home inspection report, that they contend to be more legible.  However, the photographs appended to that report are admittedly clearer in the State Farm exhibits.

[11]  Mr. Grandpré did testify that the cracks depicted in this report appear to be map pattern cracking, however, the quality of the subject photo is poor, as noted by State Farm's counsel in the deposition.  (Ex. 2, p. 88-89).

312 Conn. 714, 754 (2014)(citing *United Technologies* with approval). Under this multiple injury trigger, those policies in effect where there has been an exposure to a cause of injury, an injury in fact, or when an injury manifests will be triggered. *Security Ins. Co. of Hartford v. Lubermens Mut. Cas. Co.,* 264 Conn. 688, n. 12 (2003).

While the Kims' would suggest that the point of substantial impairment would certainly be an "injury in fact," the policy covering that period is not the only policy potentially triggered in this situation. At a minimum, the policy in effect when the problem manifested itself – when the Kims' knew or should have known that there was a significant structural flaw in their home – would also be implicated. *Security Ins. Co. of Hartford v. Lubermens Mut. Co.,* 264 Conn. 688, n. 12 (2003)(suggesting that manifestation occurs when a claim manifests itself or "becomes reasonably capable of diagnosis."); *see also Parker v. Worcester Ins. Co.,* 247 F.3d 1, 4 (1st Cir. 2001). The record on summary judgment is clear that the Kims' first notice that that cracking constituted a significant structural flaw would have occurred in early July 2014. (Ex. 3; Ex. 5, p. 56-57; Ex. B, p. 30-31). Moreover, the record on summary judgment does not clearly establish that the Kims even perceived the cracking in their home before July of 2014. (Ex. 5, p. 48; Ex. B, p. 31-32). As such, even assuming for the sake of argument that the substantial impairment of the structural integrity of the Kims' home occurred at some time prior to 2004, the 2013-2014 State Farm policy would still be triggered and, therefore, summary judgment is not appropriate on this point.

**VI.** **The Suit Limitation Provision does Not Bar this Matter.**

The Kims do not dispute that a suit limitation provision is a valid contractual term, however, they suggest that State Farm's application of the suit limitation period is contrary to the law. State Farm suggest that the suit limitation period runs from the time that the Kims first noticed cracking in the basement walls of their home, irrespective of their understanding of the nature and significance of those cracks. Even setting aside the notion that the record does not establish the Kims' noticed the cracking at the time State Farm asserts, the case law is clear that where there exists a nonobvious loss, such as a decay or deterioration collapse, the suit limitation period runs from the point in time when a reasonable homeowner knew or should have known that there was a significant structural flaw in their home. *Parker v. Worcester Ins. Co.,* 247 F.3d 1, 5 (1st Cir. 2001).

*Parker* involved a home afflicted by the same chemical reaction found in the Kims' home. In *Parker,* the Federal District Court for the District of Massachusetts ruled that the claim was time barred because the plaintiff had seen cracks in the basement walls many years before making a claim and that the presence of cracking alone was sufficient to put a reasonable person on notice of a substantial problem. *Parker v. Worcester Ins. Co.,* 247 F.3d 1, 3 (1st Cir. 2001). The First Circuit reversed the District Court on the grounds that due to the myriad of potentially applicable policy exclusions – such as damage for cracking short of a collapse – that the plaintiff "had reason to believe that no loss *covered by the*

*policy* had occurred until she learned or should have learned that a different kind of damage (i.e., a substantial structural flaw) existed…" *Id.* at 5. As a result, the *Parker* Court held that "in the case of a non-obvious injury or loss, the suit limitations period begins to run only when a reasonable person would have learned of the injury or loss." *Id.* at 4. Noting the absence of any Connecticut case directly on point, the First Circuit thought "no one would expect an insured to be stripped of coverage where a reasonable person would not have detected the injury or loss." *Id.*

It appears clear from the factual record presented that the earliest that the Kims were aware that there was a significant structural flaw in their home was July 3, 2014. (Ex. 3; Ex. 5, p. 56-57; Ex. B, p. 30-31). It was not until a prospective buyer noticed the cracking condition within the Kims' basement walls, that the Kims were made aware of the cracking or were made aware that the cracking was not normal. (Ex. 5, p. 45; Ex. B, p. 30-31). It was this interaction that lead the Kims to consult with an engineer to evaluate the cracking present in their home, which consultation lead to the discovery that the cracking was symptomatic of an internal chemical reaction that threatened the structural integrity of the home. (Ex. 3; Ex. 5, p. 45; Ex. B, p. 30-31). Therefore, it appears clear from the record that the limitation period began to run with respect to the collapse loss at the beginning of July, 2014, the earliest time that the Kims were aware that their home had significant structural issues. Suit was then timely commenced less than one year later, on June 15, 2016. (Ex. J, Return of Service).

On the other hand, even if the Kims perceived cracking at or near the time that they purchased their home, State Farm has offered no evidence suggesting that the Kims knew, or should have known, at the time that a loss covered by the policy had occurred or that the home had a substantial structural flaw.  In fact, the record is far from clear that the Kims ever observed the cracking prior to July of 2014, much less understood the structural threat posed to the home.  (Ex. 5, p. 48; Ex. B, p. 31-32).  Nor does the record support State Farm's assertion that the Kims repaired or directed the repair of any cracks.  (Ex. 5, p. 68-68, 71-72).[12] However, to the extent that State Farm has made arguments with respect to what the Kims should have known, a decision on what a reasonable person "should have known," while a legal conclusion like negligence, is one of those conclusions that most courts leave to jurors.  *Parker v. Worcester Ins. Co.,* 247 F.3d 1, 5 (1st Cir.2001) *citing Childers Oil Co. v. Exxon Corp.*, 950 F.2d 1265, 1272-73 (4th Cir. 1992); *Bacewicz v. NGM Ins. Co.,* 2010 WL 3023882, * 8 (D. Conn. 2010).  Therefore, the Kims suggest that State Farm has not met its burden in proving that this case is untimely filed.  Rather, it appears clear from the record that suit was timely filed less than a year after the Kims learned of the structural flaw within their home.  (Ex. J).

---

[12] Mr. Kim testified that he had a handyman named Brian who was hired to paint the deck, but would go around the home and take care of various odds and ends of his own accord.  (Ex. 5, p. 68-69).  Mr. Kim did not direct him to patch any cracks in the exterior nor did he have any present recollection of any patching work being done.  (Ex. 5, p. 68-69, 71-72).  State Farm's assertion that the Kims did any patch work is, respectfully, not supported by the record and the testimony relied upon by State Farm on that point is pure speculation.

The arguments advanced by State Farm, with respect to the running of the suit limitation, rely heavily upon what the Kims contend is a harmless error made by this Honorable Court in *Roberts.* The issue in *Roberts* was when a case is commenced for the purposes of the suit limitation provision, not when the limitation period begins to run. *Roberts v. Amica Mut. Ins. Co.,* 2015 WL 7458510 (D.Conn. 2015). The District Court made no opinion as to when the limitation period begins to run, noting the parties' agreement on when the limitation period began. *Roberts v. Amica Mut. Ins. Co.,* 2015 WL 7458510, *3 (D. Conn. 2015). While the *Roberts* Court cited to the *Parker* matter, it incorrectly phrased the rule as beginning when the homeowner knew or should have known of the cracking, whereas the *Parker* Court phrased the trigger in terms of learning that the damage went beyond mere cracking and instead represented a significant structural flaw. *Roberts v. Amica Mut. Ins. Co.,* 2015 WL 7458510, *3 (D. Conn. 2015) *citing Parker v. Worcester Ins. Co.,* 247 F.3d 1, 5 (1st Cir.2001). This misstatement was inconsequential to the true issue in that matter.

By contrast, this Honorable Court has analyzed and applied the rule of *Parker* in a number of matters related to coverage for Mottes concrete damage, in which fixing the time that the suit limitation began to run was a material issue. In *Bacewicz* this Honorable Court found that the limitations period began to run when "a reasonable person would have learned of the injury or loss." *Bacewicz v. NGM Ins. Co.,* 2010 WL 3023882, * 7 (D. Conn. 2010) *citing Parker v. Worcester Ins. Co.,* 247 F.3d 1, 5 (1st Cir.2001). In later discussion of the *Parker* case, the

*Bacewicz* Court discussed the distinction between observing cracking and learning of the threat to the structural integrity of the home posed by the cracking condition in a discussion of the *Parker* matter. *Id.* at 8. In any event, this Honorable Court denied summary judgment on the point by finding "a reasonable jury could draw different conclusions as to whether a reasonable person should have known before September 23, 2007, that a substantial structural impairment was present in the Bacewiczes' house." *Id.* Most recently, in *Belz,* this Honorable Court again noted that the suit limitation period begins to run when the insured learned that a covered loss had occurred. *Belz v. Peerless Ins. Co.,* 2016 WL 4599892, * 6 n2 (D. Conn. 2016). Therefore, the Kims respectfully suggest that State Farm's reliance on *Roberts* is misplaced, and that the level of knowledge required to trigger the running of the suit limitation provision is better elucidated in those other cases within this Honorable Court which addressed the issue more directly.

## CONCLUSION

For the foregoing reasons, the plaintiffs, Geung-Ho Kim and Jae Kim, respectfully request that this Honorable Court deny the defendant, State Farm Fire and Casualty Company's, Motion for Summary Judgment.

**PLAINTIFFS,**
**GEUNG-HO KIM and**
**JAE KIM**

By: */s/ Jeffrey R. Lindequist*
    Jeffrey R. Lindequist, Esq.
    One Monarch Place, Suite 2220
    Springfield, MA 01144
    (413) 736-4101 – *Telephone*
    (413) 736-4582 – *Facsimile*
    jlindequist@mdparkerlaw.com
    Federal Bar #ct29425

## CERTIFICATE OF SERVICE

    I hereby certify that on October 21, 2016, a copy of foregoing Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey R. Lindequist*